consent was its assertion in its original brief that

> [t]he record of this case demonstrates that Bache, the sole petitioning creditor, was in receipt of a preferential transfer (the July, 1981 transfer) as defined by 11 U.S.C. § 547, and that it refused *and still refuses* to disgorge that transfer. Under these facts, the Bankruptcy Court was in error in refusing to find that Bache lacked have [sic] standing to act as a petitioning creditor, and that the petition for involuntary relief should be dismissed.

Record, Vol. I at 160. In response, the district court concluded after "a thorough examination of the record transmitted on appeal ... that MAC did not raise the preference issue in regard to Bache until *after* the Bankruptcy Judge had entered judgment in this case." Record, Vol. I at 20 (footnote omitted).

On appeal to us, MAC concedes that its pleadings did not expressly raise its voidable transfer defense against Bache. MAC Brief at 41. MAC now argues that the bankruptcy court erred in not ruling on whether there was a voidable transfer[7] because the voidable transfer issue was tried by implied consent. The record and briefs before us clearly show that MAC is raising its trial-by-implied-consent theory for the first time on this second appeal. We decline MAC's invitation to consider its new theory on the ground that it was waived by not being argued to the district court in MAC's first-level appeal.

### IV.

We find that the district court did not err in dismissing all issues that MAC presented on appeal. For that reason, we do not reach the other issues that MAC presents on this appeal. The district court order dismissing MAC's appeal is

AFFIRMED.

Anne Windfohr SOWELL, et al.,
Plaintiffs-Appellees,
Cross-Appellants,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant-Appellant, Cross-Appellee.

No. 85–1141.

United States Court of Appeals,
Fifth Circuit.

May 16, 1986.

Rehearing and Rehearing En Banc
Denied June 23, 1986.

---

Calvin, Dylewski, Gibbs, et al, Dennis M. Dylewski, John L. Verner, Mark A. Bukaty, Houston, Tex., Jerome Mrowca, Lombard, Ill., for defendant-appellant, cross-appellee.

Kelly, Appleman, Hart & Hallman, Robert C. Grable, Dee J. Kelly, Wesley N. Harris, Ft. Worth, Tex., for plaintiffs-appellees, cross-appellants.

Before GEE, RUBIN and DAVIS, Circuit Judges.

GEE, Circuit Judge:

Natural Gas Pipeline Co. of America ("Natural") appeals from a district court order holding that royalty payments due plaintiffs, Anne Windfohr Sowell and the trustees of the Mary Couts Burnett Trust, must be based on the average market price paid for all gas in six Texas counties. Natural further complains that the district court erred in terminating one of its leases with plaintiffs. Sowell brings a cross-appeal arguing that the district court, 604 F.Supp. 371, erred in holding that a 1933 agreement applied to liquid hydrocarbons taken from plaintiffs' wells. We affirm.

I.

The natural gas wells involved in this case are located on the Burnett Dixon Creek Ranch in the Texas Panhandle. Natural, the named lessee or the successor in interest to the named lessee, produces gas from 32 wells on leases covering almost 14,000 acres of the ranch. These wells have been in production since the 1930's.

A 1945 Consolidation Agreement, as amended in 1951, combined for operations 8,300 acres. The remaining 5,400 acres are in the Landergin/Blasdel lease. A General Division Order executed in 1933 controls royalty payments for gas production from leases covered in the Consolidation Agreement and the Landergin/Blasdel lease.[1] In 1980, Anne Windfohr Sowell succeeded to the one-half interest in lands covered by the leases that was formerly owned by the S.B. Burnett Estate. The Mary Couts Burnett Trust owns the remaining one-half interest.

Natural produces, gathers, and processes the natural gas on plaintiffs' land. After the gas is gathered at the 32 wells, it is metered near each wellhead; and plaintiffs' royalty is based on the metered volume. In the line between each wellhead and its gas meter is located a drip pot, which collects small amounts of water and substances referred to as drips, condensate, or natural gas liquids. The drips consist of heavier hydrocarbon molecules which assume a liquid form when subjected to a mechanical separation process or to a reduction in temperature or pressure.

The district court found as fact and the parties do not challenge that, in addition to the 32 drip pots located at the wellheads, the drips are separated by drip vessels in the lines as the gas passes along Natural's pipeline and by other devices at processing plants. After the gas is metered at the wellhead, it is gathered and compressed at booster stations that Natural operates along lateral pipelines before entering Natural's main line, the 24-inch Gray County line. Gas is transported through the Gray County line and metered at Natural's processing plant in Fritch, Texas. It is then transmitted to a processing plant in Stinnett, Texas, where it is processed and additional condensate and natural gas are recovered. In addition to the 32 drip pots located between wellhead and the gas meter at each well, there are approximately 118 drip vessels along Natural's lateral lines and the Gray County line.

The sale of condensates such as those collected in Natural's drip collectors has become profitable only within the last 10 years as a result of increases in petroleum prices and increased condensate production since the mid-1970's. The increased production has occurred as it has become necessary to compress the gas artificially along the pipeline. This pumping has been needed as gas reservoirs have become depleted and the natural pressure of the gas in the reservoir has become weaker and less able to force the gas along the pipeline to the processing plants. The artificial compression has caused additional quantities of condensate to drip from the stream.

The district court found that Natural had been paying plaintiffs a royalty based on the volume of gas metered at the wellheads. Throughout the period relevant to the suit, the gas at issue was dedicated to interstate commerce. The district court further found that, since 1978, Natural paid royalties for all gas produced from plaintiffs' land based on the Unit Value specified in Opinion 749 of the Federal Power Commission, now the Federal Energy Regulatory Commission, and Section 104 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, *et seq.*, which sets a ceiling price for the first sale of "old flowing gas." After metering the gas Natural adjusts the royalty rate based on the BTU content of the gas. The BTU content, which refers to British Thermal Unit, is a measure of the heat content of the gas. For a variance in the BTU content either above or below the standard of 1,000 BTU's per cubic foot, Natural increases or decreases plaintiffs' royalty payments proportionately, based on the gas rate paid.

1. In relevant part, the Gas Division Order provides that the lessee will pay the lessor a royalty for sulfur-free gas produced in its natural state from said well or wells ... at the following rates ... for the remaining life of this contract ... one-eighth (⅛) of the average market price per thousand cubic feet that is paid for gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas.

The BTU adjustment to a limited extent compensates plaintiffs for the heavier hydrocarbons contained in the natural gas stream. However, plaintiffs receive no additional royalties for the drips, condensates and natural gas liquids separated and sold by defendants.

In 1982, plaintiffs sued Natural claiming that (1) under the terms of the 1933 Gas Division Order ("GDO"), Natural had to pay royalties on the basis of the average market price being paid for all gas in the six counties; (2) Natural had to pay additional separate royalties to cover liquid hydrocarbons; and (3) Natural had breached the Landergin/Blasdel lease and, by the terms of that lease, it had terminated. After a trial to the court, plaintiffs received judgment on the first and third claims but not on the second. Natural appeals the judgment on the first and third claims; Sowell cross-appeals on the second claim. We turn now to each of these issues.

## II.

The first issue before the Court is whether the district court erred in interpreting the GDO provision on the royalty to be paid for natural gas. Insofar as the district court interpreted the GDO without relying on extrinsic evidence, this issue presents a question of law not subject to the clearly erroneous standard for review.[2] *Thorton v. Bean Contracting Co., Inc.*, 592 F.2d 1287, 1290 (5th Cir.1979).

In holding for plaintiffs, the district court rejected Natural's argument that it had been paying the appropriate royalty based on the maximum ceiling price for "old flowing gas" under Opinion 749 of the Federal Power Commission or under Section 104 of the Natural Gas Policy Act. The district court held instead that the GDO royalty language, "one-eighth (⅛) of the average market price per thousand cubic feet that is paid for gas in Carson, Hutchinson, Potter, Moore, Gray and Wheeler Counties, Texas," requires Natu-

ral to pay royalties based on the average price for *all* gas in the six-county area, regardless of the legal classification of the gas. In so holding, the district court distinguished the GDO language from market value leases that, under Texas and Fifth Circuit case law, allow consideration for royalty purposes of sales only of such gas as is physically and legally comparable to the gas being produced from the lessor's land.

Natural argues on appeal that the district court committed various errors on this issue. Its first assertion is that the district court failed to rely on Texas and Fifth Circuit precedent equating market price with market value for purposes of determining royalty payments. Had the district court done so, Natural maintains that the court would have concluded that the GDO calls for Natural to pay royalty in accordance with the market value of gas in the six county area. The market value would be determined by reference to comparable sales of gas, specifically, old gas dedicated to interstate commerce. There is no room in such an analysis for considering the average price of all gas in the six county area.

Natural next asserts that the district court improperly altered the wording of the GDO. The alleged alteration is the insertion of the word "all" in the GDO provision calling for a royalty based upon the average market price of *all* gas sold in the six-county area. Natural Brief at 12–13. Natural contends that because market price has the same legal meaning as market value—which involves a comparability analysis—the only other gas to be considered is that which is physically and legally comparable to the gas at issue.

 The GDO royalty provision was unambiguous to the district court. It is likewise unambiguous to us. The clause at issue calls for a royalty payment based on the average market price for gas in a six-

---

**2.** Because we find the contract to be unambiguous, this issue presents solely a question of law.

county area. As plaintiffs point out, Natural's insistence on the legal equivalence of market price and market value is largely irrelevant here. The critical distinction, the one on which the district court relied, is that every market value lease to which we have been referred requires the royalty to be based on the market price or market value of the gas produced from the lessor's land.[3] In contrast, the GDO refers to the average market price of gas in a six-county area. Be it market price or market value, the GDO requires that an average be taken for gas sold in the six counties. The mathematical universe for computing the average is gas sales in the six-counties. There is absolutely no contractual limiting of that universe to gas that is physically or legally comparable to what is produced on the ranch. If the shorthand for such a calcula-

tion is that *all* gas sales are considered, so be it. Natural's arguments are unpersuasive in the face of the clearly unambiguous GDO royalty provision. We affirm the district court holding on this issue.[4]

### III.

The second issue that Natural raises is whether the district court erred in terminating the Landergin/Blasdel lease. The termination clause in that lease agreement provides that the lessor may terminate upon breach of lease "terms, covenants, conditions and requirements." Plaintiff Exhibit 5. The termination clause also provides that

> before advantage is taken of any such breach that notice thereof shall be served on Parties of Second Part or their agents in charge and reasonable time allowed

---

**3.** As the district court observed, in market value cases the royalty clause in the market value lease makes the royalty value the market value of the specific gas produced from the lease:

> *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 242 (Tex.1981): "on gas, including casinghead gas or other gaseous substances, *produced from said land* and sold or used off the premises, or used in the manufacture of gasoline or other product therefrom, by the lessee, [shall be] the *market value at the well of one-eighth of the gas so sold or used,....*"
>
> *Bowers v. Phillips Petroleum Co.,* 692 F.2d 1015, 1016 n. 1 (5th Cir.1982); "on gas, including casinghead gas or other gaseous substance, *produced from said land* and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the *market value at the well of one-eighth of the gas sold or used,....*"
>
> *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146, 1149 n. 1 (5th Cir.1982): "on gas, including casinghead gas or other gaseous substances, *produced from said land* and sold or used off the premises or for the extraction of gasoline or other product therefrom, *the market value at the well of one-eighth of the gas so sold or used,....*"
>
> *Brent v. Natural Gas Pipeline Company of America,* 626 F.2d 1261, 1262 (5th Cir.1980), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982): the *market value at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises."*
>
> *Hawley v. Natural Gas Pipeline Company of America,* 626 F.2d 1261, 1262 (5th Cir.1980), *cert. denied sub nom. Brent v. Natural Gas Pipeline Co. of America,* 454 U.S. 1148, 102

S.Ct. 1012, 71 L.Ed.2d 302 (1982): "the *market value at the well of one-eighth (⅛) of the gas produced, saved, and sold or used off the leased premises."*

> *Kingery v. Continental Oil Co.,* 626 F.2d 1261, 1263 (5th Cir.1980), *cert. denied sub nom. Brent v. Natural Gas Pipeline Co. of America,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982): "on gas, including casinghead gas or other gaseous substance, *produced from said land* and sold or used off the premises or in the manufacture of gasoline or other product therefrom, *the market value at the well of one-eighth of the gas so sold or used,* provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale."

*See also*

> *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870–71 (Tex.1968): "for gas produced from any oil well and used by lessee for the manufacture of gasoline, *one-eighth of the market value of such gas....*"
>
> *J.M. Huber Corp. v. Denman,* 367 F.2d 104, 107 n. 4 (5th Cir.1966): "to pay the Lessors monthly for one-fourth (¼) of the gas produced at the mouth of the well ... *the market price of such gas....*"
>
> *Foster v. Atlantic Refining Co.,* 329 F.2d 485, 488 (5th Cir.1964): "one-eighth (⅛) of that produced and saved from said land, the same to be ... sold *at the market price therefor* prevailing for the field where produced...."

**4.** Remand for recalculation of damages is not warranted here. Natural's argument that data used in calculating damages included unlawful prices was not raised before the district court and was thus waived.

within which to correct the conditions of which complaint is made. *Id.* On July 15, 1983, plaintiffs sent a demand letter to Natural advising that Natural had breached the terms of the Landergin/Blasdel lease by failing to pay royalties "based upon the six-county average gas price specified in the 1933 Division Order ..." and as fully explained in an attached amended original complaint subsequently filed on August 8, 1983. Plaintiffs informed Natural that it had until September 1, 1983 to correct the breach and, if it did not, that plaintiffs would terminate the lease as of September 1, 1983. Natural ignored this notice and demand.

Having found that Natural had breached the GDO by paying the improper royalty, the only question for the district court here was whether plaintiffs had complied with the notice provisions of the termination clause. The district court found that plaintiffs had complied with the lease terms by giving Natural notice and a reasonable time to remedy the breach. The court therefore held that the Landergin/Blasdel lease terminated as of September 1, 1983 and that plaintiffs were entitled to damages from Natural's continued operations.

On appeal, Natural challenges the district court's finding that plaintiffs complied with the notice provisions. Natural asserts that it was not reasonable to expect it to cure a breach after a judicial proceeding had already been instituted to determine whether a breach had occurred. Furthermore, it is said to be a fundamental defect in plaintiff's demand letter that it failed to give Natural any clue as to what Natural had to pay to "correct the conditions of which complaint is made." Natural Brief at 23–24.

As a threshold matter, we note that a termination-for-breach provision in a contract is enforceable in Texas. *Cole Petroleum Co. v. United States Gas & Oil Co.,* 121 Tex. 59, 41 S.W.2d 414, 416 (1931). In addition, the termination clause at issue here is a "notice and demand" clause. Williams and Meyers, *Oil and Gas Law* § 682 (1984).[5] Natural's argument about the reasonableness of being expected to cure during pendency of the action would convert this notice and demand clause into a judicial ascertainment clause. This we cannot permit.

Natural's second argument is likewise without merit. Natural persists in claiming that plaintiffs gave it no idea of what it had to pay to correct the breach. This argument ignores the fact that the demand letter expressly informed Natural that the proper royalty was to be "based upon the six-county average gas price specified in the 1933 Division Order...." The argument also ignores the fact that the original complaint, filed eight months earlier on November 12, 1982, identified the proper royalty as "the 'average market price' paid for gas in the six named counties." Record at 8. There can be no question that Natural was advised of the condition of the breach. Rather than respond to the demand letter, either to correct or to contest the demand, Natural was silent. The district court did not err in terminating the Landergin/Blasdel lease.[6]

---

5. Unlike the notice and demand clause, the judicial ascertainment clause was created to prevent Natural's present predicament from ever arising. Williams & Meyers, *Oil and Gas Law,* at § 682.

6. The authority Natural cites for the proposition of what is needed for a valid notice and demand is unpersuasive. The lease in *Savoy v. Tidewater Oil Co.,* 218 F.Supp. 607, 610 (W.D.La. 1963), *aff'd,* 326 F.2d 757 (5th Cir.1964) (notice shall "point out the particulars in which they were deemed deficient"), required the lessor to "notify Lessee in writing of the facts relied on as constituting a breach hereof." *Id.* at 610 n.2.

The GDO requires the lessor to give notice of and a reasonable time to remedy. Similarly, in *Montana Eastern Pipe Line Co. v. Shell Oil Co.,* 216 F.Supp. 214, 221 (D.Mont.1963), *aff'd,* 342 F.2d 430 (9th Cir.1965), *cert. denied,* 382 U.S. 975, 86 S.Ct. 541, 15 L.Ed.2d 466 (1966) ("'notice should express clearly the dereliction of which complaint is made'"), the letters claimed to be notice merely stated that an action to quiet title was being considered without indicating which clause had been breached. In the present case, plaintiffs informed Natural that it had breached the royalty clause.

## IV.

The final issue before this Court, raised by plaintiffs on cross-appeal, is whether the district court erred in holding that plaintiffs are not entitled to additional royalties on natural gas liquids. What Natural has paid plaintiffs has not directly compensated plaintiffs for the drip. The only allowance made is that the royalty paid is BTU adjusted for the hydrocarbons represented by the drips, condensate, and natural gas liquids. In their complaint, plaintiffs sought to recover a royalty share of value Natural realized from selling the condensate and natural gas liquids that are removed from the natural gas stream in drip pots located at the wellhead and along the main and lateral pipelines and at processing plants in Fritch and Stinnett, Texas. The royalty share would equal the amount by which the drips, condensate and natural gas liquids, less reasonable extraction costs, exceeds the BTU adjusted royalty paid for the gas. In essence, then, plaintiffs sought royalties for the component elements of the gas. Plaintiffs based their claim on the argument that because the GDO does not cover or provide a royalty value for liquid hydrocarbons separated from the gas, the underlying leases control royalties on liquid hydrocarbons. These leases provide expressly for royalties on natural gasoline and condensates, Plaintiffs Exhibits 17, 18 and 19, or for royalties on the basis of "proceeds" or "in kind." Moreover, even if the GDO covers liquid hydrocarbons, it specifies no value for liquids, thus the underlying leases still control.

The district court rejected plaintiffs' argument, finding that by the plain language of the royalty clause of the GDO plaintiffs are entitled to royalty for sulfur-free gas produced in its natural state. Following *Lone Star Gas Co. v. Stine*, 41 S.W.2d 48, 49 (Tex.Comm'n App.1931, judgment adopted), the district court concluded that a grant of gas includes a grant of all component elements of the gas, including liquid hydrocarbons recovered from the gas stream. *See also Humble Oil & Refining Co. v. Poe*, 29 S.W.2d 1019, 1020 (Tex. Comm'n App.1930, judgment adopted).

Since the natural gas liquids here are—with the exception of some drip collected at the wellhead before metering—produced as gas, production being what triggers the royalty obligation, plaintiffs are not entitled to royalty based on component elements that assume the form of natural gas liquids after the gas is metered. Plaintiffs must, however, be paid a royalty on drips that collect in drip pots at the wellhead before metering.

On appeal, plaintiffs continue to insist that it is the underlying leases instead of the GDO that provide the applicable royalties for liquid hydrocarbons. Plaintiffs argue that the district court erred in concluding on today's facts that a grant of gas includes a grant of all component elements of the gas. Plaintiffs distinguish *Lone Star Gas Co. v. Stine* on the basis that it involved an outright sale without provision for royalty payments. Plaintiffs assert that when a mineral owner makes an outright grant of gas, as in *Stine* and *Poe*, the gas and all components are conveyed. But when the lessor reserves a royalty, unless some part of the component elements of the gas is expressly excluded, the lessor is entitled to payment for all component elements. The component theory is inapplicable when a lease, such as theirs, provides for other than a flat rate payment on production from a well. Finally, plaintiffs attach considerable significance to the fact that, as we have already found, the GDO refers to gas sold in a six-county area whereas the cases on which the district court relied address royalties for gas at the wellhead. Plaintiffs Brief at 42 (*citing Union Producing Co. v. Pardue*, 117 F.2d 225 (5th Cir.1941); *O'Neal v. Union Producing Co.*, 153 F.2d 157 (5th Cir.1946)).

The GDO requires Natural "to pay royalty for sulfur-free gas produced in its natural state from said well or wells ... at ... one-eighth (⅛) of the average market price per thousand cubic feet that is paid for gas" in the six counties. As the district court determined, it is production that trig-

gers the royalty obligation. Plaintiffs acknowledge, as they must, that the liquids that collect in Natural's drip pots along its pipeline are "constituents of the gas stream." Plaintiffs Brief at 7. As components, all liquids recovered downstream from the meter are a portion of the "gas produced in its natural state." *See Lone Star Gas Co. v. Stine,* 41 S.W.2d at 49 ("the term 'natural gas' is meant [to] include all the constituent elements composing the same.") The GDO unambiguously covers gas produced in its natural state, and that is the composition the liquids have when produced. Under the terms of the GDO and Texas law, plaintiffs are not entitled to royalties for liquids that condense after the gas is metered. The GDO could easily have been drafted to provide for that.

V.

The district court order is AFFIRMED.