Clyde T. CARTER and Doris Carter Corum, Independent Executors of the Estate of Harry Lee Carter, Deceased, Appellants,

v.

EXXON CORPORATION, Appellee.

No. 11–91–090–CV.

Court of Appeals of Texas, Eastland.

Nov. 25, 1992.

Rehearing Denied Dec. 31, 1992.

James R. Woodley, Dan C. Perry, Law Offices of Dan C. Perry, Kerrville, Steven R. Sampson, College Station, Eldridge Moak, Sorrell & Moak, Jacksonville, for appellants.

Reagan Burch, Rob McMillin, Baker & Botts, William N. Blanton, III, Houston, John S. Ament, Jacksonville, for appellee.

## OPINION

McCLOUD, Chief Justice.

This appeal involves an alleged underpayment of gas royalties. The jury found that no underpayment had occurred. We affirm.

Exxon Corporation owns several oil and gas leases located in the Neches Field of Anderson and Cherokee Counties which were executed by Harry Lee Carter. Clyde T. Carter and Doris Carter Corum, independent executors of the Estate of Harry Lee Carter, deceased, sued Exxon alleging that Exxon had failed to pay the correct amount due for gas royalties as called for by the leases from April 1, 1977, to March 31, 1990.[1] The provision for the payment of gas royalties is identical in all of the leases in question. The payment provision reads as follows:

> The royalties to be paid by lessee are: [O]n gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or

---

1. Appellants do not challenge Exxon's payment of oil royalties.

other product therefrom, the market value at the well of one-eighth of the gas so sold or used provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale.

All of the gas produced from the Carter leases during the time period in question was "sold or used off the premises or for the extraction of gasoline or other product therefrom." We are concerned only with Exxon's obligation to pay "market value at the well" for the gas.

The gas produced from the Carter leases was in the form of casinghead gas. This casinghead gas was initially sent to a "separator" for the purpose of removing oil and condensate from the gas. The resulting "raw gas" was then transported to the Neches Gas Plant, a gas processing facility built by Exxon. The gas produced from the Carter leases contained various liquefiable hydrocarbons. These liquefiable hydrocarbons were extracted from the raw gas at the Neches Gas Plant as a result of several processing steps.

The liquefiable hydrocarbons left the Neches Gas Plant in a combined liquid state known as "raw make." The raw make was transported from the Neches Gas Plant to another Exxon facility for further processing. The various liquefiable hydrocarbons were then separated out of the raw make and converted into marketable "liquid products" that were either used or sold by Exxon. The liquid products that were made from the gas from the Carter leases included ethane, propane, butane, and pentane.

The gas that remained after the liquid products were extracted was used by Exx-

on in several different ways. Most of the residue gas that remained after processing in the Neches Gas Plant was used for gas lift operations. Exxon utilized a gas lift system for the production of oil in the Neches Field. Residue gas was injected into the reservoir in order to "lighten" the oil. This process allowed the oil to be brought to the surface without the use of pumping equipment. Another portion of the residue gas was used as fuel for the Neches Gas Plant.

Some of the residue gas was sold in interstate commerce for most of the time period in question. Exxon entered into a contract to sell gas to United Gas Pipe Line Company in 1966. Exxon sold gas to United under the contract until December 1986. Exxon then sold gas to UER Marketing Company. There were no sales of gas after mid–1988.

Appellants asserted at trial that Exxon failed to pay the correct amount of royalties for gas used to manufacture liquid products, the gas used for gas lift operations on other leases (hereinafter lease transfer gas), and the gas sold to pipeline companies.[2] The jury found that Exxon did not fail to pay the correct amount of royalties required by the leases on any of the gas.

■ Appellants challenge the adverse jury findings regarding the underpayment of gas royalties in their first point of error.[3] Appellants contend that the evidence conclusively established an underpayment of gas royalties as a matter of law in regard to gas used to manufacture plant liquids and to lease transfer gas.[4] A party

---

2. Appellants were not entitled to royalties for gas used as plant fuel or for gas used for gas lift operations on the lease from which that gas was produced. Appellants were entitled to royalties for any residue gas sold by Exxon.

3. The Court's charge reads in pertinent part as follows:

Question No. 1
(A) Did Exxon fail to pay royalties based on the market value at the well of the gas used to make liquid products?
(B) Did Exxon fail to pay royalties based on the market value at the well of the lease transfer gas?

(C) Did Exxon fail to pay royalties based on the market value at the well of the residue gas sold to United Gas Pipe Line or other pipeline companies?
Answer "Yes" or "No."

(A) Answer: ___No___
(B) Answer: ___No___
(C) Answer: ___No___

4. Appellants alleged at trial that Exxon failed to properly pay royalties for gas sold. On appeal, however, appellants waive any complaint as to Exxon's payment of gas royalties for sales of residue gas under their first point of error.

attempting to overcome adverse fact findings as a matter of law must surmount two hurdles. First, the record must be examined for evidence that supports the jury's findings while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answers, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner v. Marathon Oil Company,* 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982).

### Gas Used to Manufacture Liquid Products

The raw natural gas containing liquefiable hydrocarbons that enters the Neches Gas Plant is measured by its volume as gas. The amount of residue gas that leaves the plant is less than the amount of raw gas that enters the plant as a result of the liquefiable hydrocarbons being extracted from the raw gas. "Gas used to manufacture liquid products" refers to this decline in the volume of natural gas that occurs when the liquefiable hydrocarbons are extracted from the raw natural gas.

Exxon used two calculation methods in determining its basis for the payment of royalties on gas used to make liquid products.[5] Exxon's primary method for payment of royalties was to base royalty payments on one-third of the value of the liquid products sold or used as liquid products. Exxon's authority for payment of royalties in this manner was the division orders executed by appellants on behalf of the estate. The division orders provided that settlements for gas processed in or near the field where produced would be based on the net value at the well. The net

value would be determined (as the division orders apply to the gas involved in this appeal) on the same basis as settlements to other producers of gas of like kind and quality processed at the same plant.

Exxon used the higher of either the one-third value of liquid products or the interstate market value of the gas used to make liquid products as the basis for royalties. Exxon referred to this interstate market value calculation method as a "keep whole" amount. Exxon contends that appellants were only entitled to the interstate market value of the gas used to make liquid products. Exxon asserts that royalty owners were "kept whole" because they never received less than the interstate market value of the gas.[6]

The greatest part of appellants' claim involves gas used to manufacture liquid products. Appellants asserted at trial that Exxon underpaid gas royalties to the estate in the amount of $1,732,193 for gas used to make liquid products.[7] Appellants contend that the basis for calculating royalty payments on the gas should be the higher of either the price the liquid products were sold for as finished liquid products less the cost incurred in manufacturing the liquid products or the intrastate market value of the gas used to make liquid products.

Appellants' first point of error is based on the argument that the evidence conclusively established an underpayment of royalties as a matter of law. Their assertion of the liquid products calculation method requires an analysis broader than a review of the evidence. Initially, we must determine if the payment provision of the leases permits the royalties to be calculated on

---

5. "Basis" refers to the figure upon which the royalty owner's share is determined. It represents the total value of all the minerals extracted from a lease during a particular accounting period.

6. Appellants revoked the division orders in 1981. Exxon continued to use the "⅓ method" to calculate the basis for royalty payments after 1981 whenever this method resulted in a payment higher that the interstate value of the gas used to make liquid products.

7. Appellants assert on appeal that the evidence conclusively established, as a matter of law, an underpayment of gas royalties for gas used to manufacture liquid products in the amount of $897,816. Appellants contend that Exxon's representative at trial, Roland F. Pohler, "admitted" that, if appellants' legal theory is correct in regard to the valuation of gas used to manufacture liquid products, the estate had been underpaid in the amount of $897,816. Our disposition of this case does not necessitate an interpretation of the effect of Pohler's statements.

the basis of the value of the liquid products.

Appellants assert that the value of the refined components of the natural gas (less manufacturing costs) is a permissible method for calculating the basis for royalty payments. Appellants are, in essence, seeking royalties for the finished component elements of the natural gas. The leases provide that, for gas "used off the premises or for the extraction of gasoline or other product therefrom," royalties are to be "the market value at the well of one-eighth of the gas so sold or used." In other words, the lessee is obligated to pay royalties on the gas "used ... for the extraction of gasoline or other product therefrom." The leases do not provide for payment of royalties on the liquid products extracted from the gas.

In *Sowell v. Natural Gas Pipeline Company of America*, 789 F.2d 1151, 1157–58 (5th Cir.), *rehearing denied, en banc*, 793 F.2d 1287 (5th Cir.1986), the royalty owners sought to recover a royalty share of the value realized by the lessee from selling liquid products extracted from the natural gas produced from their leases. The division order executed by the parties required the lessee "to pay royalty for sulfur-free gas produced in its natural state from said well or wells." The *Sowell* court noted that production was the event that triggered the royalty obligation in the division order. The court reasoned that, since the natural gas liquids were produced as gas, the royalty owners were not entitled to royalties based on component elements that assume the form of natural gas liquids after the gas is produced and metered. The court held that the division order unambiguously covered gas produced in its natural state and that, therefore, the royalty owners were not entitled to royalties for liquids that condense after the gas is metered.

We agree with the reasoning of *Sowell.* The payment provision of the leases in question provides that royalties are to be paid on the gas used for the extraction of liquids. The inclusion of the words "at the well" in the royalty provision specifies that

royalties are owed for gas that is produced in its natural state, not on the components of the gas that are later extracted. See *Danciger Oil & Refineries v. Hamill Drilling Co.*, 141 Tex. 153, 171 S.W.2d 321 (1943); *Lomex Corporation v. McBryde*, 696 S.W.2d 200 (Tex.App.—San Antonio 1985, no writ).

We further hold that the leases do not allow the market value of the gas used to manufacture liquid products to be calculated on the sales value of the liquid products. "At the well" designates the point in the gas production process where market value is to be calculated on the gas used for the extraction of liquid products. Market value is to be calculated the instant the gas is produced from the reservoir. The liquid products valuation method advocated by appellants provides for the calculation of the market value of the gas at a post-production step in the processing procedure. The liquid products valuation method is, therefore, not permitted by the leases because it involves a determination of market value after the gas is produced.

Having rejected the liquid products valuation method asserted by appellants, we must now address the remainder of their argument under the first point of error. Appellants contend that the evidence conclusively established an underpayment of royalties as a matter of law. The first *Sterner* hurdle requires us to examine the record for evidence that supports the jury's findings, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.*, supra at 690. The jury found that Exxon did not fail to pay royalties based on the market value at the well on gas used to make liquid products. We must, therefore, look for evidence in the record that supports the jury's answer of "no."

Exxon contended at trial that the royalty owners were only entitled to the interstate value of the gas used to make liquid products. The evidence presented by Exxon supported its position that the royalty owners always received royalties based on at least the interstate value of the gas. Appellants contend that the intrastate value

of the gas used to make liquid products is the legally proper method for determining the market value of the gas.[8] Appellants argue that the evidence presented by Exxon does not support the jury's findings because the evidence was "legally incorrect" in that it was based solely on the interstate value of the gas. We must, therefore, resolve the question of whether or not gas used to make liquid products could be valued according to interstate prices.

Exxon relies upon the Natural Gas Policy Act, 15 U.S.C.A. § 3301 et seq. (West 1982 & Pamph.Supp.1992) in arguing that interstate prices should be used to determine the value of the gas used to make liquid products. Section 3314, repealed effective January 1, 1993, established a maximum lawful price scheme for natural gas committed or dedicated to interstate commerce. Section 3301(18)(A)(ii) defines gas "committed or dedicated to interstate commerce" as:

> [N]atural gas which, if sold, would be required to be sold in interstate commerce (within the meaning of the Natural Gas Act) under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act.

Exxon argues that, under the terms of the contract with United, the gas used to make liquid products was natural gas which, if sold, would be required to be sold in interstate commerce.

Neither party disputes the fact that the gas sold to United was gas sold in interstate commerce. The question we must resolve is whether or not the terms of the contract applied to the gas used to manufacture liquid products. The gas purchase contract entered into by Exxon and United conveyed residue gas. The contract defined residue gas as:

> [G]as remaining after processing in Seller's [Exxon's] Neches Gas Plant in Cherokee County, Texas, which is produced from both gas wells and oil wells from the Woodbine Formation in the Neches Field, Cherokee and Anderson Counties, Texas; provided; however, that such term shall also include the gas produced from said Woodbine Formation which is bypassed around Seller's Plant.

According to the above definition, residue gas has two meanings. Residue gas represents: (1) gas remaining after processing in the Neches Gas Plant and (2) gas bypassed around the Neches Gas Plant. The gas used to manufacture liquid products does not fit under the first definition of residue gas. As its name implies, gas used to make liquid products is consumed as a result of the processing procedure.

The effect of the second definition on gas used to make liquid products would depend upon other provisions of the United contract and the statutory definition of "committed or dedicated to interstate commerce." The contract gave Exxon the option of extracting liquefiable hydrocarbons from the gas.[9] Exxon exercised this option by processing the gas at the Neches Gas Plant. Exxon would not have processed the gas at the gas plant if it had declined to exercise this option. In other words, Exxon would have bypassed the gas around the Neches Gas Plant if it had not wanted to extract the liquefiable hydrocarbons. Under the second definition of residue gas, United was bound to accept gas that was bypassed around the Neches Gas Plant.

---

8. At the time, gas sold in intrastate commerce was worth more than gas sold in interstate commerce.

9. The applicable contract provision states:
   The gas to be delivered hereunder shall be natural gas as produced in its natural state from the well or wells, free of objectionable liquids and solids, except that Seller shall separate or cause to be separated any liquid hydrocarbons and *may extract, or cause to be extracted, any natural gasoline or other liquefiable hydrocarbons, which may be produced*

*with or as a part of such gas.* (Emphasis added)

According to the terms of this provision, Exxon has an obligation to separate liquid hydrocarbons and an option to extract liquefiable hydrocarbons. The liquid products that are made from the gas recovered from the Carter leases are liquefiable hydrocarbons because they are in a gaseous state at the time of production. Exxon, therefore, has an option but not an obligation to extract the liquid products from the gas.

Gas "committed or dedicated to interstate commerce" is natural gas which if sold, would be required to be sold in interstate commerce. Section 3301(18)(A)(ii). As the name implies, gas used to make liquid products was natural gas that was "used" rather than "sold." However, if the gas used to make liquid products had been sold, it would have been sold to United under the second meaning of residue gas. Since the gas used to make liquid products was natural gas which, if sold, would be required to be sold in interstate commerce, this gas was subject to the maximum lawful price scheme established by Section 3314. Exxon's evidence concerning the interstate value of the gas was, therefore, not "legally incorrect." We hold that there is sufficient evidence to support the jury's finding under the first *Sterner* hurdle in regard to gas used to manufacture liquid products.

### Lease Transfer Gas

■ The argument of both parties in regard to lease transfer gas is similar to their argument concerning gas used to make liquid products. Exxon contends that lease transfer gas should be valued at the interstate price, and appellants assert that it should be valued at the intrastate price. Under the first *Sterner* hurdle, we must examine the record for evidence that supports the jury's finding that Exxon did not underpay royalties for lease transfer gas.

The evidence presented at trial by Exxon dealt solely with the interstate value of the lease transfer gas. Exxon asserts that, under the United contract, the lease transfer gas was gas which, if sold, would have been sold in interstate commerce. We agree with Exxon's contention. The lease transfer gas was residue gas because it was "gas remaining after processing" in the Neches Gas Plant. Exxon's use of this gas in its gas lift operation was allowed under a reservation in the United contract. However, if this gas had been "sold" rather than "used," it would have been sold in interstate commerce. The lease transfer gas was, therefore, subject to the interstate pricing scheme established by the Natural Gas Policy Act. Exxon's evidence

of interstate value in regard to lease transfer gas was sufficient evidence to support the jury's finding. Appellants' first point of error is overruled.

### Admissibility of Evidence

■ Appellants assert in their second point of error that the trial court erred in allowing Exxon to put on evidence regarding the $20,000,000 in oil royalties paid by Exxon to the Carter estate. A party attempting to obtain a reversal of a judgment based upon an error of the trial court in admitting evidence must show: (1) that the trial court did in fact commit error and (2) that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1); *Gee v. Liberty Mutual Fire Insurance Company*, 765 S.W.2d 394, 396 (Tex.1989).

Appellants contend that the evidence concerning the amount of oil royalties paid to the estate was irrelevant and unfairly prejudicial. Evidence which is not relevant is inadmissible. TEX.R.CIV.EVID. 402. Furthermore, even if a particular piece of evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R.CIV.EVID. 403.

■ Appellants based their irrelevancy and unfair prejudice arguments on the fact that this suit dealt solely with the payment of gas royalties. Appellants contend that, since the payment of oil royalties was not in issue, this evidence should be characterized as nothing more than testimony concerning the wealth of a litigant. Testimony concerning the wealth or poverty of a party is ordinarily inadmissible in a civil case. *Cooke v. Dykstra*, 800 S.W.2d 556, 562 (Tex.App.—Houston [14th Dist.] 1990, no writ). This type of evidence is inadmissible because it is irrelevant and often prejudicial. *Block v. Waters*, 564 S.W.2d 113, 115 (Tex.Civ.App.—Beaumont 1978, no writ).

In light of the evidence offered by appellants at trial, we disagree with appellants' characterization of the evidence regarding

the amount of oil royalties. Appellants offered the testimony of Joe Carter, an heir of the Carter estate, who testified that he had been employed as a bus driver for over 34 years. He further testified that he was still working as a bus driver in order to build up his retirement.

Appellants also offered the expert opinion testimony of Charles G. Guffey. Guffey testified at length regarding the costs that should have been deducted from the gas royalty payments. While stating his opinion concerning the proper costs that should have been allocated for the Neches Gas Plant, Guffey stated that Exxon realized much more than just its operating costs from the gas used to make liquid products. More specifically, he stated that Exxon had received a $9,000,000 return in 1982 alone on its original investment of $9,000,000 in building the Neches Gas Plant.

The trial court initially granted appellants' motion in limine barring Exxon from making any references to the amount of oil royalties paid to the Carter estate. The trial court later changed its position on the admissibility of this evidence after appellants presented their evidence. The trial court ruled that the above-mentioned testimony of Joe Carter and Guffey "opened the door" so as to allow the admission of the amount of oil royalties paid. The trial court stated that Joe Carter's testimony had the effect of portraying the heirs of the Carter estate as being "poor folks." The trial court was also concerned with what effect Guffey's testimony, as to how much money Exxon made from the Neches Gas Plant, would have on the jury.

After reviewing the testimony presented at trial, we agree with the trial court's characterization of the testimony of Joe Carter and Guffey. When viewed before trial, the oil royalties were not relevant because they were not in issue. Appellants' portrayal of the heirs of the Carter estate as being "poor folks" had the effect of presenting an otherwise collateral fact before the jury. Guffey's testimony regarding the profits Exxon made from the Neches Gas Plant also had the effect of

injecting a collateral question for the jury's consideration. We hold that the trial court did not err in allowing Exxon to counteract the effect of the testimony of Joe Carter and Guffey. The evidence concerning oil royalties was relevant because of appellants' presentation of similar evidence, and it was not unfairly prejudicial since it tended to offset the prejudice caused by appellants' similar evidence.

■ Irrespective of our finding that the trial court did not commit error in allowing this evidence, we further note that the admission of this evidence did not cause the rendition of an improper judgment. The majority of the evidence presented by appellants was offered to support their argument that the lease transfer gas and the gas used to make liquid products should have been valued according to intrastate prices and/or the value of the liquid components. Under our ruling on appellants' first point of error, we have found that appellants were only entitled to the interstate value of the gas. We have also ruled that the liquid components valuation method is not allowed by the leases as a matter of law. In other words, Exxon's payment of royalties based on the interstate value of the gas was the proper payment method as a matter of law. The admission of the amount of the oil royalty payments did not cause the rendition of an improper judgment because the jury's findings that Exxon did not fail to properly pay gas royalties was correct as a matter of law. Appellants' second point of error is overruled.

The judgment of the trial court is affirmed.

ARNOT, J., not participating.