JERRY E. SMITH, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from part II of the majority opinion. That part affirms the holding that the King Ranch Processing Agreement (the “Agreement”), rather than the McGill leases, governed royalties on liquid plant products.
The original McGill leases provided more favorable royalty treatment of liquid gas products than did the Agreement. The McGills argue that those leases, and not the Agreement, should govern the liquids that are separated from the residue gas at.the Kelsey plant but fractionated at the King Ranch plant. I agree.
The Agreement applies by its terms to “any gas produced [from the McGill leases] which may be processed in the [King Ranch] plant.” The McGills’ argument is twofold: (1) None of their “gas” was processed at the King Ranch plant; all that was processed at King Ranch was liquids; and (2) what was done at King Ranch was not “processing,” but “fractionating.” I find compelling a variant on the “gas” argument: An examination of the Agreement shows that it did not provide for the treatment of liquids sent to the King Ranch plant only for fractionation.
The McGills point to language in the Agreement stating that “there will or may be three types of gas entering the plant:” (1) full well stream gas, (2) gas that has been run through a separator on the lease, and (3) casing head gas. In a footnote, the majority quotes this passage but does not deal with it in any way. To the contrary, I believe the passage is dispositive on this issue, for, obviously, the liquids from the McGill leases that entered the plant were not any of the three types of gas contemplated under the lease.
Exxon, in turn, points to caselaw that holds “gas” to include all the component parts of that which comes out of the well. See Sowell v. Natural Gas Pipeline Co., 789 F.2d 1151, 1157 (5th Cir.1986). Neither Sowell nor the case upon which it is based, Lone Star Gas Co. v. Stine, 41 S.W.2d 48, 49 (Tex. Comm’n App. 1931, judgment adopted), provides the unmitigated support that Exxon seems to assign to it.
The leases at issue in Sowell specifically provided for royalties on “sulfur-free gas produced in its'natural state." See Sowell, 789 F.2d at 1157 (emphasis added). There *345 fore, the royalty owners could not claim royalties based upon the separate value of liquid hydrocarbons that condensed downstream from meters located on the lease. Under that agreement, “it is production that triggers the royalty obligation.” Id. The gas as produced — in its “natural state” — included those hydrocarbons in gaseous form, so the royalty owners were compensated only on the basis of their gaseous form. The Sowell court did not hold that “gas” always includes all gas products; rather it was limited by the provisions of the lease at issue stating that royalties would be based on gas “in its natural state.”
Here, the Agreement specifically contemplated the various manifestations of hydrocarbon molecules and set compensation levels accordingly. It provided royalties on plant products — butane, propane, and other value-added products. Those royalties were explicitly based' on the state in which the gas arrived at the King Ranch plant. Thus, products that are “extracted from gas delivered to the plant without prior separation of liquids from the gas shall be based on 100% of the value at the plant of the plant products allocated to such gas.” On the other hand, for gas that arrived at the King Ranch plant that “prior to delivery to the plant has been' run through a separator[1] on the lease,” the royalty would be based upon only a third or less of the plant products actually produced from that gas.
Thus, the Agreement specifically contemplated that the full well stream, containing all the liquids, was much more valuable than gas that arrived at the plant with some liquids missing. Unlike the agreement in Sowell, the agreement here did not treat “gas” as including all the component parts of the full well stream.
Furthermore, and perhaps more importantly, there is the specific and unambiguous language of the Agreement to which we must give effect. The Agreement purports to cover three specific types of gas, types that do not include the product at issue here. Moreover, the Agreement establishes a two-tier system for treating the different sorts of gas, and that system does not address this product. Finally, based upon the overall scheme of the Agreement — which gives better treatment to products that contain more liquid hydrocarbons — it is difficult to say that this product, which consists purely of liquid hydrocarbons, should be treated unfavorably in the way Exxon has- done.
Exxon tries to shoehorn the treatment of liquid hydrocarbons into an agreement that by its terms does not, and by its structure cannot, cover those substances. The Agreement cannot govern the fractionation of these liquid hydrocarbons. While the majority has fashioned a fair and logical ease for ruling as it has, I believe it has given insufficient attention to the contract provisions I have discussed. Concluding that, on this specific issue, the result should be otherwise, I respectfully dissent on that issue but concur in the remainder of the opinion.

. A separator removes some liquids from the well head stream but does so incompletely. The Kelsey plant was not merely a'separator, but was a bona fide, processing plant that completely removed the liquids from the gas, so that all that was left was residue gas.