Opinion filed March 23, 2006












 
 
  
 
 







 
 
  
 
 




Opinion filed March 23, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-03-00361-CV 

                                                    __________

 

                            CONOCOPHILLIPS COMPANY, Appellant

 

                                                             V.

 

                                  INCLINE
ENERGY, INC., Appellee

 



 

                                         On
Appeal from the 238th District Court

 

                                                        Midland
County, Texas

 

                                                Trial
Court Cause No. CV-43,326

 



 

                                                                   O
P I N I O N

 

After a bench trial, the trial court held that the
pricing provision in a gas purchase agreement was ambiguous.  It entered a judgment for Incline Energy,
Inc. (the gas seller)[1]
against ConocoPhillips Company (the gas purchaser).  We find that the agreement was not ambiguous,
and we reverse and render judgment that Incline take nothing by its lawsuit.








There is a rather lengthy history of the events
giving rise to this lawsuit.  We believe
that a recitation of only a brief portion of that history is necessary to a
resolution of this appeal.

Incline=s
claim against ConocoPhillips arises out of a pricing provision in a 1988
amendment to a 1986 gas purchase agreement. 
The agreement covered gas produced from a gas well known as the Olivia
Spencer No. 1.  The 1988 amendment
provided, in relevant part, as follows:

Subject
to all terms, conditions and provisions of the Agreement, for the period
beginning on the effective date hereunder and extending for the Term hereof,
the price per MMBTU to be paid by Buyer to Seller each month shall be eighty
percent (80%) of the price(s) which Buyer receives under its Resale
Agreement(s) for all gas purchased and sold hereunder at the Point(s) of
delivery, such gas produced from the subject lands and leases. 

 

For purposes of this opinion, we offer an
oversimplified description of the nature of gas that is produced from a gas
well.  As it comes from the well, gas is
basically in a vaporous form and contains various impurities as well as various
compounds.  The compounds can be removed
from the vapor and turned into marketable liquids known as natural gas liquids
(NGLs).  In order to remove NGLs from the
natural gas, it is necessary to transport the gas through a pipeline to a
processing facility where the gas undergoes various procedures that result in
the extraction of the NGLs and leave residue gas.[2]  The NGLs which have been extracted are used
in the manufacture of many different products from gasoline to plastics and
foam.  The residue gas is sold.








The term AMMBTU@ as used in the gas purchase agreement
refers to the measurement of vaporous gas by using volume and heating
value.  The volume and the heating value
in this case were determined when the gas entered ConocoPhillips=s pipeline.  ConocoPhillips based its payment to Incline
on the weighted average residue gas price applied to the full volume and
heating value (MMBTU) at the point of delivery from the Olivia Spencer No. 1.[3]  Thus, it paid Incline 80% of the weighted
average residue gas price as applied to MMBTUs of the entire gas stream
measured at the point of delivery. 
ConocoPhillips contends that this is the proper measurement of the gas
purchase price under the contract.

Incline contends that it should be paid on
processed NGLs in addition to residue gas. 
Incline sued ConocoPhillips for breach of contract, specific
performance, declaratory relief, and attorney=s
fees.  The trial court agreed with Incline
on its breach of contract claim and awarded Incline $795,312.80 as damages
based upon prices for vaporous gas as well as prices for NGLs from the date
that ConocoPhillips became the purchaser of gas under the agreement.  The trial court also awarded Incline
$85,013.80 in prejudgment interest and $184,607.48 as attorney=s fees. 
In its judgment, the trial court denied all other relief not expressly
granted.

The primary concern when construing a written
contract is to determine the true intentions of the parties as expressed in the
agreement.  Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983).  If the
written agreement is worded such that it can be given a definite legal meaning,
it is not ambiguous.  Courts will construe
unambiguous contracts as a matter of law. 
Id.

Whether a contract is ambiguous is a question of
law to be decided by the court.  Friendswood
Dev. Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996).  A court makes this determination by looking
at the contract as a whole while considering the circumstances present when the
parties entered it.  Nat=l Union Fire Ins. Co. of Pittsburgh,
Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  We review de novo the issue of whether a
contract is ambiguous.  Reilly v.
Rangers Mgmt, Inc., 727 S.W.2d 527, 529 (Tex. 1987).  Here, the trial court based its decision upon
the conclusion that the agreement was ambiguous.  We disagree and will address the issue de
novo.

A court may find an ambiguity only if the language
in the contract is susceptible to two or more reasonable interpretations.  Enter. Leasing Co. of Houston v. Barrios,
156 S.W.3d 547 (Tex. 2004).  Parol
evidence is not to be used for the purpose of creating an ambiguity.  Nat=l
Union Fire Ins., 907 S.W.2d at 520. 
Such evidence may only be considered after the court has determined that
the contract is ambiguous.  Id.








There are two classifications of ambiguities in
contract law.  A contract may be either
patently ambiguous or it may be latently ambiguous.  Friendswood, 926 S.W.2d at 282.  A contract is patently ambiguous when the
ambiguity is apparent on the face of the contract.  Nat=l
Union Fire Ins., 907 S.W.2d at 520. 
A latent ambiguity is one that exists when a contract is unambiguous on
its face Abut fails
by reason of some collateral matter when it is applied to the subject matter with
which it deals.@  Friendswood, 926 S.W.2d at 282-83.

In the trial court=s
conclusions of law, it concluded that A[a]n
ambiguity exists as to whether or not the parties to the Gas Processing
Agreement contemplated payment when the gas purchased was processed on the
basis of both residue gas and natural gas liquids or on residue gas alone.@

The trial court also concluded that, A[w]hen processing began, the latent
ambiguity sprang into effect,@
resulting in two different, reasonable interpretations.  Although we believe that the trial court=s conclusions, when taken together,
actually amount to a determination that the agreement was latently ambiguous,
we will address patent as well as latent ambiguity.

We do not believe that the contract is patently
ambiguous because it can be given a definite and certain legal meaning and also
because it is not subject to two or more reasonable interpretations. Id.  We make this determination by examining the
contract as a whole in light of the circumstances present at the time that the
contract was entered.  Id.

Under the agreement, the price which
ConocoPhillips was to pay per MMBTU, measured at the point of delivery, was 80%
of the price ConocoPhillips received under its resale agreement for all gas
purchased and sold under the agreement. 
There is no question about the meaning of the term AMMBTU.@  MMBTU is defined in the agreement as one
million BTUs.  The contract defines Apoint of delivery@ to be the place gas purchased and sold
under the agreement is delivered in accordance with Article VI of the
agreement.  Article VI of the agreement,
among other things, further defines Apoint
of delivery@ to be
the point at which the gas enters ConocoPhillips=s
pipeline from the outlet of any of Incline=s
treating facilities.  It is worthy to
note that the contract also provides that the title to the gas changes from
Incline to ConocoPhillips at this point.

The contract defines Agas@ as follows:

AGas@ shall mean the effluent vapor stream,
including elements and compounds contained therein, at the Point of Delivery
herein provided of each Gas Well, Gas Condensate Well and Oil well located on
the Subject Lands and Leases, excluding liquid hydrocarbons which are removed
by conventional gas/oil field separators of the type in use on the date hereof.

 








The contract then requires ConocoPhillips to
measure MMBTUs at the point of delivery, which is near the wellhead, and to
pay, per MMBTU so measured, 80% of the amount it received when it resold the
gas.  This court has previously held in a
royalty payment case that, when there is a wellhead measurement, payment is due
for gas in its natural state, not on the liquid hydrocarbons which are later
extracted.  Carter v. Exxon Corp.,
842 S.W.2d 393 (Tex. App.CEastland
1992, writ denied); see also Sowell v. Natural Gas Pipeline Co. of Am.,
789 F.2d 1151, 1157-58 (5th Cir. 1986). 
We see no difference when the agreement calls for calculations to be
made at the point of delivery at or near the wellhead and before it enters
ConocoPhillips=s
pipeline.

The Olivia Spencer No. 1 agreement refers to the
prices that buyer received under its AResale
Agreements(s).@  At the time of the execution of the agreement
and the amendment, the Natural Gas Policy Act (NGPA) of 1978 was in
effect.  See 15 U.S.C. ' 3301 et seq.  The NGPA referred to Aresale@ as the sale of natural gas all or a
portion of which was both purchased and resold in transactions that are first
sales as defined in the NGPA.  Here, any
sale would occur first between ConocoPhillips and Incline when the gas was
delivered into the pipeline. 
ConocoPhillips was a vertically integrated company.  The Aresale@ would take place at the time that
ConocoPhillips resold the residue gas. 
Resales based upon residue gas are, as far as this case is concerned,
always stated in the Code of Federal Regulations in terms of MMBTUs.  Any reference to natural gas liquids is stated
in terms of gallons.  The Olivia Spencer
No. 1 contract calls for a price based upon MMBTUs, not gallons, and contains
no provisions for sharing in the expenses and revenues related to processing.

Furthermore, Article III, 3.1(d) of the agreement
in this case speaks directly to NGLs.  By
the terms of the agreement, Incline may remove all oil and liquid hydrocarbons
by Aconventional mechanical gas/oil field
separators@ prior to
the point of delivery.  The agreement
provided that A[s]eller
shall not be permitted to remove or recover hydrocarbons from the gas other
than such as can be removed through the use of conventional mechanical gas/oil field
separators.@

We hold that the agreement, as amended, can be
given a definite and certain meaning in this case and that, as a matter of law,
it was not patently ambiguous.








We next examine the trial court=s conclusion that the agreement was
subject to a latent ambiguity and that the latent ambiguity Asprang into@
effect when the gas from the Olivia Spencer No. 1 began to be processed.  A latent ambiguity exists when a contract is
unambiguous on its face Abut
fails by reason of some collateral matter when it is applied to the subject
matter with which it deals.@  Friendswood, 926 S.W.2d at 282-83.  In National Union, the court gave this
example of a latent ambiguity:  A[I]f a contract called for goods to be
delivered to >the
green house on Pecan Street,=
and there were in fact two green houses on the street, it would be latently
ambiguous.@  Nat=l
Union Fire Ins., 907 S.W.2d at 520 n.4. 
Here, we are not dealing with collateral matters, as with the example in
National Union.  We are dealing
with the very heart and essence of the agreement:  the pricing mechanism.  The agreement was not latently ambiguous as a
matter of law.

Because the contract was unambiguous, it should be
enforced as written.  As written, the
agreement requires ConocoPhillips to measure MMBTUs at the point of delivery
which is near the wellhead and to pay per MMBTU so measured 80% of the amount
for which it first resells gas.  The
resale of gas would exclude NGLs which have been removed prior to the time of
the first gas resale.

The judgment of the trial court is reversed, and
judgment is rendered that Incline, and those it represents, take nothing.  Our holding on this issue is dispositive of
this appeal, and we need not discuss other issues or cross-issues on appeal.

 

JIM R. WRIGHT

CHIEF JUSTICE

 

March 23, 2006

Panel consists of: Wright, C.J., and McCall, J.

W. G. Arnot III retired effective July 31, 2005, and is,
therefore, not participating.











[1]Incline is not the only gas seller but claims to have
the authority to represent the other sellers in this lawsuit.





[2]We have intentionally omitted any discussion of the use
of separators, compressors, fuel, line loss, and changes brought about during
transportation as a result of varying pressures and temperatures, among other
things.  We do not believe that a
discussion of items of that nature would affect the outcome of this appeal.





[3]At the point of delivery, the gas also included the
NGLs, and they were included in the measurement of MMBTUs at that point.