In re Mark A. JACOBS, M.D., Debra C. Gunn, M.D., and Obstetrical and Gynecologist Associates, P.A., Relators.

No. 14–09–00123–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 20, 2009.

Diana L. Faust, Richard C. Harrist, Ronda M. Blackwell, Dallas, TX, Barbara

Hilburn, Elizabeth A. Kaufman, Houston, TX, for Relators.

Alexander Klein, III, Joseph Todd Trombley, Houston, TX, for Real Party in Interest.

Panel consists of Justices BROWN, BOYCE, and SULLIVAN.

## MAJORITY OPINION

JEFFREY V. BROWN, Justice.

In this original proceeding, the relators, Mark A. Jacobs, M.D., Debra C. Gunn, M.D., and Obstetrical and Gynecologist Associates, P.A., seek a writ of mandamus ordering the Honorable Mike Wood, presiding judge of Probate Court No. 2 of Harris County, to set aside his two orders of January 23, 2009—one compelling the deposition of Dr. Jacobs and one compelling net-worth discovery for the past two years—and his order of January 30, 2009, clarifying the two January 23 orders. We conditionally grant the petition in part and deny it in part.

I

Real parties in interest, Andre McCoy, Individually and as Permanent Guardian of Shannon Miles McCoy, an Incapacitated Person (the "McCoys"), have sued the relators and others[1] for negligence and gross negligence in providing medical care and treatment to Shannon while she was an obstetrical patient at Woman's Hospital of Texas from September 13, 2004 to September 14, 2004. On November 16, 2007, the McCoys served the relators with requests for discovery of net-worth information. When the relators objected to the requests for production, the McCoys filed a motion to compel discovery.

---

1. The other defendants are Woman's Hospital of Texas, Inc., CHCA Woman's Hospital, L.P. d/b/a Woman's Hospital of Texas, Houston Woman's Hospital Partner, L.L.C., and James A. Collins, M.D.

On January 23, 2009, the trial court held a hearing and signed an order directing the McCoys to amend their pleadings to provide more specific allegations of gross negligence against the relators following the completion of the depositions of Dr. Jacobs and Dr. Gunn. Subject to the filing of a sufficient pleading as to gross negligence, the trial court further ordered the relators to produce "the actual financial statements they have provided to a lender within the past two (2) years that identifies the assets and liabilities of each Defendant." Alternatively, if the relators had not submitted any such financial statement to a lender within the two years preceding the date of the order, the court ordered each relator to:

(i) Produce an affidavit swearing that no such financial statement has actually been submitted to a lender in the past two (2) years; and

(ii) Produce an affidavit under oath in the format of what would have been provided to a lender as to net worth.

The order directed that the relators produce such net-worth information no later than thirty days after the McCoys sufficiently pleaded gross negligence. In the order, Judge Wood also prohibited the McCoys from seeking to compel any additional responses to their outstanding net-worth discovery requests, and announced that any net-worth information provided to the McCoys would be "safeguarded by a protective order." On January 23, Judge Wood signed another order granting the McCoys' motion to compel the deposition of Dr. Jacobs, and directed that the deposition may not exceed three hours on the record.

On January 26, the relators filed a motion to clarify the order regarding the discoverability of net worth. The relators stated they did not understand when to produce the net-worth information to com-ply with the order and requested the trial court to so specify. Also, the relators requested a written order on what net-worth matters, if any, the McCoys would be allowed to cover during the depositions of Dr. Jacobs and Dr. Gunn.

On January 30, the trial court signed an order clarifying its prior orders regarding the discoverability of net-worth information. The trial court directed the relators to produce the information by February 6, 2009, and ruled that the McCoys would be permitted to depose Dr. Gunn and Dr. Jacobs about their net worth.

In their petition, the relators argue that the trial court abused its discretion with respect to the orders of January 23 and 30 by directing the relators to (1) produce net-worth information for the past two years in the form of actual financial statements they have provided to lenders; (2) create a net-worth document in the format of what would have been provided to a lender; and (3) present Dr. Jacobs and Dr. Gunn for deposition regarding their net worth without any temporal or subject-matter limitations. The relators further assert they have no adequate remedy by appeal because their rights to due process and privacy are in jeopardy of being permanently lost or compromised.

## II

To be entitled to the extraordinary relief of a writ of mandamus, the relator must show that the trial court clearly abused its discretion and he has no adequate remedy by appeal. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding). The party resisting discovery bears the heavy burden of establishing an abuse of discretion and an inadequate remedy by appeal. *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex.2003) (orig. proceeding) (per curiam). A trial court abuses its discretion if it reaches a

decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law, or if it clearly fails to correctly analyze or apply the law. *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex.2005) (orig. proceeding) (per curiam); *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding).

 Whether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of costs and benefits of interlocutory review. *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 464 (Tex.2008) (orig. proceeding). Because this balance depends heavily on circumstances, it must be guided by analysis of principles rather than simple rules that treat cases as categories. *Id.* "Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding); *see also In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.,* 290 S.W.3d 204, 207 (Tex. 2009) (orig. proceeding) ("Used selectively, mandamus can 'correct clear errors in exceptional cases and afford appropriate guidance to the law without the disruption and burden of interlocutory appeal.'") (quoting *In re Prudential,* 148 S.W.3d at 138). Thus, in determining whether appeal is an adequate remedy, we consider whether the benefits of mandamus review outweigh the detriments. *In re BP Prods. N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex. 2008) (orig. proceeding). Appeal is not an adequate remedy when the appellate court would not be able to cure the trial court's discovery error. *In re Dana Corp.,* 138 S.W.3d 298, 301 (Tex.2004) (per curiam) (orig. proceeding); *In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003) (orig. proceeding).

## A

 The relators assert the trial court abused its discretion by ordering them to produce their net-worth information to the McCoys. A defendant's net worth is relevant in a suit involving exemplary damages. *Lunsford v. Morris,* 746 S.W.2d 471, 473 (Tex.1988) (orig. proceeding), *overruled on other grounds, Walker,* 827 S.W.2d at 842; *Miller v. O'Neill,* 775 S.W.2d 56, 58 (Tex.App.-Houston [1st Dist.] 1989, orig. proceeding). Therefore, in cases where punitive or exemplary damages may be awarded, parties may discover and offer evidence of a defendant's net worth. *Lunsford,* 746 S.W.2d at 473. Generally, in cases concerning the production of financial records, the burden rests upon the party seeking to prevent production. *In re Brewer Leasing, Inc.,* 255 S.W.3d 708, 712 (Tex.App.-Houston [1st Dist.] 2008, orig. proceeding [mand. denied]); *In re Patel,* 218 S.W.3d 911, 916 (Tex.App.-Corpus Christi 2007, orig. proceeding).

 The relators argue the McCoys are not entitled to discovery on net worth until they have established a prima facie case of gross negligence. However, the Texas Supreme Court has expressly rejected this contention. *See Lunsford,* 746 S.W.2d at 473 (rejecting requirement of prima facie showing because "[o]ur rules of civil procedure and evidence do not require similar practices before net worth may be discovered").[2] Therefore, under Texas law, a party seeking discovery of net-worth

2. We note other jurisdictions require a prima facie showing of entitlement to recover puni-

information need not satisfy any evidentiary prerequisite, such as making a prima facie showing of entitlement to punitive damages, before discovery of net worth is permitted. *In re House of Yahweh*, 266 S.W.3d 668, 673 (Tex.App.-Eastland 2008, orig. proceeding); *In re Garth*, 214 S.W.3d 190, 192 (Tex.App.-Beaumont 2007, orig. proceeding [mand. dism'd] ); *In re W. Star Trucks US, Inc.*, 112 S.W.3d 756, 763 (Tex. App.-Eastland 2003, orig. proceeding); *Al Parker Buick Co. v. Touchy*, 788 S.W.2d 129, 131 (Tex.App.-Houston [1st Dist.] 1990, orig. proceeding).

The relators acknowledge the Texas Supreme Court's express holding in *Lunsford*, but argue that we should follow other jurisdictions that require a plaintiff to demonstrate a factual basis for punitive damages before being allowed to do net-worth discovery.[3] Even though *Lunsford* is over twenty years old, the Texas Supreme Court has not revisited this issue.[4] As an intermediate court of appeals, we are bound by the supreme court's ruling in *Lunsford* and, therefore, we decline the relators' invitation. *See Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 666 (Tex. 2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2767, 174 L.Ed.2d 284 (2009) ("It is fundamental to the very structure of our appellate system that this Court's decisions be binding on the lower courts.");

tive damages prior to conducting discovery on a defendant's financial status. *See, e.g.,* Iowa Code Ann. § 668A.1 (1998); *Larriva v. Montiel*, 143 Ariz. 23, 691 P.2d 735, 738 (1984); *Curtis v. Partain*, 272 Ark. 400, 614 S.W.2d 671, 674 (1981), *overruled on other grounds, Lupo v. Lineberger*, 313 Ark. 315, 855 S.W.2d 293 (1993); *Herman v. Sunshine Chem. Specialties, Inc.*, 133 N.J. 329, 627 A.2d 1081, 1089 (1993); *Mark v. Congregation Mishkon Tefiloh*, 745 A.2d 777, 780 (R.I. 2000); *Cramer v. Powder River Coal, L.L.C.*, 204 P.3d 974, 980 (Wyo.2009). However, most federal courts do not require a plaintiff to make a prima facie showing of entitlement to recover punitive damages before seeking pretrial discovery of the defendant's financial information. *See, e.g., United States v. Matusoff Rental Co.*, 204 F.R.D. 396, 399 (S.D.Ohio 2001) (stating overwhelming majority of federal courts have concluded plaintiffs seeking punitive damages are entitled to discover information on defendant's financial condition without making prima facie showing of entitlement to recovery of such damages); *CEH, Inc. v. FV "Seafarer"*, 153 F.R.D. 491, 498 (D.R.I.1994) (same); *Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.*, 130 F.R.D. 149, 151 (D.Kan.1990) (same); *Doe v. Young*, 2009 WL 440478, at *2 (E.D.Mo. Feb. 18, 2009) (same); *Westbrook v. Charlie Sciara & Son Produce Co.*, 2008 WL 839745, *2 (W.D.Tenn. Mar. 27, 2008) (same); *S. Cal. Hous. Rights Ctr. v. Krug*, 2006 WL 4122148, at *4 (C.D.Cal. Sept. 5, 2006) (same).

3. Other jurisdictions require the plaintiff to establish a factual or evidentiary basis to be entitled to discovery on a defendant's net worth. *See, e.g., Bryan v. Thos. Best & Sons, Inc.*, 453 A.2d 107, 108 (Del.Super.Ct.1982); *Globe Newspaper Co. v. King*, 658 So.2d 518, 519 (Fla.1995) (citing Fla. Stat. § 768.72); *Smith v. Morris, Manning & Martin, L.L.P.*, 293 Ga.App. 153, 666 S.E.2d 683, 697 (2008) (quoting *Holman v. Burgess*, 199 Ga.App. 61, 404 S.E.2d 144, 147 (1991)); *Breault v. Friedli*, 610 S.W.2d 134, 139–40 (Tenn.Ct.App. 1980). At least two states go so far as to require the jury to return a verdict awarding punitive damages prior to the plaintiff's conducting discovery on a defendant's financial status. *See, e.g., Ex parte Hsu*, 707 So.2d 223, 225–26 (Ala.1997) (citing Ala.Code § 6–11–23(b)); *Prior v. Brown Transp. Corp.*, 103 A.D.2d 1042, 478 N.Y.S.2d 435, 436 (N.Y.App. Div.1984) (quoting *Rupert v. Sellers*, 48 A.D.2d 265, 368 N.Y.S.2d 904, 912 (N.Y.App.Div. 1975)).

4. After *Lunsford*, the supreme court established a bifurcated procedure for conducting trials involving claims for punitive damages because of the "very real potential" that evidence of a defendant's wealth will prejudice the jury's determination of other disputed issues in tort cases. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 41.009 (Vernon 2008) (providing for bifurcated trial on claim for punitive damages).

*Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent. . . . That function lies solely with this Court."). In accordance with *Lunsford,* the McCoys are not required to make a prima facie case, or any other evidentiary showing, of entitlement to punitive damages before seeking discovery of the relators' net-worth information.

### B

The relators also argue evidence of their net worth is not relevant because the McCoys have not alleged sufficient facts to support their claim of gross negligence under section 41.001(11) of the Texas Civil Practices and Remedies Code. Section 41.001(11) defines "gross negligence":

(11) "Gross negligence" means an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.*

The McCoys allege Dr. Jacobs and Dr. Gunn *knowingly* failed to: (1) adequately and appropriately treat Shannon's disseminated intravascular coagulopathy ("DIC") [5]; (2) appreciate the severity of Shannon's coagulopathy in light of abnormal lab values indicating that she was actively bleeding and suffering from DIC; (3) aggressively treat Shannon's DIC with adequate blood products and blood-volume replacement; and (4) repeatedly order appropriate coagulation profiles and to serially re-check Shannon's blood work or to monitor and evaluate her clotting factors [6] to determine how well, or how poorly, she was responding to treatment.

The McCoys further allege Dr. Jacobs *knowingly* failed to: (1) verify that his orders for blood-volume replacement were being carried out and Shannon was being administered blood products as ordered; and (2) appropriately and aggressively manage Shannon's DIC from the outset of her admission by ordering and administering additional units of fresh frozen plasma to increase Shannon's blood volume and to correct her consumptive coagulopathy before the delivery of her baby.

The McCoys also allege Dr. Gunn *knowingly* failed to: (1) appreciate that Shannon's DIC was depleting and consuming her clotting factors and that if these clotting factors were not replaced through aggressive blood-volume replacement and clotting-factor replacement,

---

**5.** DIC "is a rare, life-threatening condition that prevents a person's blood from clotting normally. It may cause excessive clotting (thrombosis) or bleeding (hemorrhage) throughout the body and lead to shock, organ failure, and death." *WebMD, "Disseminated Intravascular Coagulation (DIC),"* http://www.webmd.com/a-to-z-guides/disseminated-intravascular-coagulation-dictopic-overview (last visited July 7, 2009). To treat DIC, "[t]ransfusions of blood cells and other blood products may be necessary to replace blood that has been lost through bleeding and to replace clotting factors used up by the body." *Id.*

**6.** "Clotting factor" refers to "any of several plasma components (as fibrinogen, prothrombin, and thromboplastin) that are involved in the clotting of blood." Merriam–Webster OnLine, "clotting factor," http:// merriam-webster.com/medical/clottingfactors (last visited July 8, 2009).

Shannon's blood would not be able to coagulate effectively at the time she delivered her baby; (2) recognize and appreciate that Dr. Jacobs had undertreated Shannon; (3) recognize, appreciate, and appropriately respond to Shannon's tachycardia on September 14, 2004, by more aggressively treating her DIC; (4) order Laisix (a diuretic medication that increases urine output) for Shannon, even though she knew that Shannon was suffering from DIC and actively bleeding, and did not need to be administered a diuretic medication; (5) recognize, appreciate, and properly respond to the fact that Shannon's condition was deteriorating (as evidenced by her tachycardia (rapid heartbeat) and urine output), and that she was developing hypovolemic shock (shock caused by reduction in blood volume); and (6) recognize that she was not qualified to treat and manage Shannon's DIC and to request the help of a more specialized physician to treat and manage Shannon's DIC.

Finally, the McCoys allege the conduct of Dr. Jacobs and Dr. Gunn, when viewed objectively from their standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The McCoys further allege Dr. Jacobs and Dr. Gunn had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to Shannon's rights, safety, or welfare.

■■■■ In response to the McCoys' gross-negligence allegations, the relators argue that merely adding the word "knowingly" to existing allegations of negligence is not enough. Texas follows the "fair notice" standard for pleadings, which looks to whether the opposing party can ascertain from the pleadings the nature and basic issues of the controversy and the type of evidence that might be relevant to the controversy. *Low v. Henry,* 221 S.W.3d 609, 612 (Tex.2007); *Horizon/CMS Healthcare Corp. of Am. v. Auld,* 34 S.W.3d 887, 896 (Tex.2000). " 'A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense.' " *Horizon/CMS Healthcare,* 34 S.W.3d at 897 (quoting *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982)). Exemplary damages are special damages that must be supported by express allegations of willfulness, malice, or gross negligence that go beyond the allegations necessary to recover compensatory damages. *Al Parker Buick Co.,* 788 S.W.2d at 130. Texas law requires a plaintiff seeking production of net worth information to " 'allege facts showing that relator is liable for punitive damages.' " *Delgado v. Kitzman,* 793 S.W.2d 332, 333 (Tex.App.-Houston [1st Dist.] 1990, orig. proceeding) (quoting *Al Parker Buick Co.,* 788 S.W.2d at 131).

■■■■ Under Texas' basic pleading requirements, the McCoys' live pleadings sufficiently allege specific facts supporting gross negligence and invoke the objective and subjective standards as set forth in section 41.001(11).[7] *See* Tex. Civ. Prac. & Rem.Code Ann. Therefore, we conclude the McCoys have pleaded facts sufficient for purposes of showing they are entitled to discovery of net-worth information from

---

7. Some states do not permit a plaintiff to claim punitive damages in an original pleading, but allow for the amendment of the plaintiff's pleadings to claim punitive damages, with the trial court's permission, after satisfying a requisite evidentiary showing. *See, e.g.,* Idaho Code Ann. § 6–160.4(2) (2008); Minn. Stat. Ann. § 549.191 (2000); Or.Rev.Stat. Ann. § 31.725(2) (2007).

the relators. *See In re Garth*, 214 S.W.3d at 192 (holding plaintiff's pleadings were sufficient to notify defendants that she sought to hold them liable for punitive damages through conspiracy theory); *In re W. Star Trucks US, Inc.*, 112 S.W.3d at 763–64 (holding allegations in petition that defendant had engaged in fraudulent and malicious conduct were sufficient to permit discovery of net worth); *Delgado*, 793 S.W.2d at 333 (holding plaintiff's pleading alleging defendant was "consciously indifferent" to safety of others was sufficient to entitle plaintiff to discovery of net worth information).[8]

## C

The relators also contend the trial court's order directing them to provide net-worth information for the past two years is overly broad and unduly burdensome because it goes beyond what is necessary to demonstrate their respective *current* net worths. Discovery is limited to matters relevant to the case. *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 814 (Tex.1995) (orig. proceeding) (per curiam); *see also* Tex.R. Civ. P. 192 cmt. 1 ("While the scope of discovery is quite broad, it is nevertheless confined by the subject matter of the case and reasonable expectations of obtaining information that will aid resolution of the dispute."). A party's requests must show a reasonable expectation of obtaining information that will aid in the resolution of the dispute. *In re CSX Corp.*, 124 S.W.3d at 152. Therefore, discovery requests must be reasonably tailored to include only matters relevant to the case. *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998) (orig. proceeding) (per curiam). The Texas Supreme Court has repeatedly admonished that discovery may not be used as a fishing expedition. *K Mart Corp. v. Sanderson*, 937 S.W.2d 429, 431 (Tex.1996) (orig. proceeding) (per curiam); *Dillard Dep't Stores, Inc. v. Hall*, 909 S.W.2d 491, 492 (Tex. 1995) (orig. proceeding) (per curiam); *Texaco, Inc.*, 898 S.W.2d at 815.

The scope of discovery is a matter of trial-court discretion. *In re CSX Corp.*, 124 S.W.3d at 152. However, a trial court abuses its discretion when it compels overly broad discovery. *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600 (Tex.2006) (orig. proceeding) (per curiam); *Dillard Dep't Stores, Inc.*, 909 S.W.2d at 492. "A central question in determining overbreadth is whether the request could have been more narrowly tailored to avoid including tenuous information and still obtain the necessary information." *In re CSX Corp.*, 124 S.W.3d at 153. Overbroad requests encompass time periods or activities beyond those at issue in the case—in other words, matters of questionable relevance. *In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 180 n. 1 (Tex.1999) (orig. proceeding).

The McCoys sought five years' worth of financial information from the relators. The trial court narrowed the scope of discovery to two years' worth. But we do not believe the trial court sufficiently narrowed the scope of production because only the relators' current[9] net

---

8. The relators argue, for the first time in their reply brief, that we should consider, not only the pleadings, but also the requirement that a plaintiff must first present expert opinion of the applicable standard of care, the alleged breach of that standard, and the causal link to proceed on a health care liability claim when determining whether net worth information is relevant. We do not consider this contention because it was not raised in the trial court or in the relators' petition for writ of mandamus. *See In re TCW Global Project Fund, II, Ltd.*, 274 S.W.3d 166, 171 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding).

9. By "current," we mean as of the time the discovery is responded to, though net-worth

worth is relevant. *See In re House of Yahweh,* 266 S.W.3d at 673 (holding trial court erred in failing to limit discovery to relators' current balance sheets because earlier balance sheets would not be relevant to relators' current net worth).[10] Therefore, we conclude the trial court abused its discretion by ordering the relators to produce net-worth information beyond the relators' current net worth. *See In re Allstate County Mut. Ins. Co.,* 227 S.W.3d 667, 669 (Tex.2007) (orig. proceeding) (per curiam) (holding trial court's order was abuse of discretion because it did not limit discovery requests which were overbroad as to time and scope). Moreover, the relators do not have an adequate remedy by appeal from the production of their net worth from previous years. *See In re Weekley Homes, L.P.,* 295 S.W.3d 309, 322–23 (Tex.2009) (orig. proceeding) ("Intrusive discovery measures . . . require at a minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party."); *In re CSX Corp.,* 124 S.W.3d at 153 (holding relator lacked adequate remedy by appeal where discovery order compelled production of "patently irrelevant" documents); *Tilton v. Marshall,* 925 S.W.2d 672, 683 (Tex.1996) (orig. proceeding) (op. on reh'g) (" '[w]here . . . discovery order imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party,' " mandamus relief may be justified) (quoting *Walker,* 827 S.W.2d at 843).

## D

■ The relators also complain about the trial court's order requiring Dr. Jacobs and Dr. Gunn to answer questions about their net worth at their depositions. Allowing such inquiries without any limitations as to time or subject matter, the relators argue, is overly broad and burdensome. *See In re Alford Chevrolet–Geo,* 997 S.W.2d at 180 n. 1 (explaining overbroad requests encompass time periods or activities beyond those at issue in case, i.e., matters of questionable relevance). Further, the relators contend that answering deposition questions about information they already have provided in written discovery responses would be unnecessarily cumulative. We address this issue by observing that we are concerned not only with determining the appropriate scope of discovery of the relators' net worth under *Lunsford,* but also with employing the most efficient and least intrusive methods by which to permit the McCoys to discover that information. *See* Tex.R. Civ. P. 192 cmt. 1 (explaining scope of discovery is confined by subject matter of case and reasonable expectations of obtaining information that will aid resolution of dispute);

---

information should be updated through supplementation—as should the information in any discovery response—if it changes materially between the service of the discovery response and the time of trial. *See* Tex.R. Civ. P. 193.5(a).

**10.** Other courts have similarly held only current financial information is relevant to a punitive damages claim. *See, e.g., Hightower v. Heritage Acad. of Tulsa, Inc.,* 2008 WL 2937227, at *1 (N.D.Okla. July 29, 2008) (limiting discovery of financial information to defendant's balance sheet for 2008 and net worth for 2008); *McCloud v. Board of County*

*Comm'rs,* 2008 WL 1743444, at *4 (D.Kan. Apr. 11, 2008) (limiting production of defendant's financial information to most recent annual reports and current financial statements); *Platcher v. Health Prof'ls, Ltd.,* 2007 WL 2772855, at *3 (C.D.Ill. Sept. 18, 2007) ("Only Defendants' current assets and liabilities are relevant to the punitive damages claim against them, . . ."); *Fieldturf Int'l, Inc. v. Triexe Mgmt. Group, Inc.,* 2004 WL 866494, at *3 (N.D.Ill. Apr. 16, 2004) ("Plaintiffs' request for non-current financial information is irrelevant to punitive damages determination.").

*In re Weekley Homes, L.P.*, 295 S.W.3d at 321 ("[T]rial courts should be mindful of protecting sensitive information and utilize the least intrusive means necessary to facilitate discovery.").

Allowing litigants to delve without limitation into personal finances not only raises serious privacy concerns, but also provides an opportunity for "needless abuse and harassment." *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 331–32 (Tex.1993) (Gonzalez, J., concurring). In light of these concerns, we believe it is appropriate to limit the scope of oral-deposition inquiry into net worth. *See Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 553 (Tex.1990) (orig. proceeding) (explaining scope of discovery is limited by legitimate interests of a party to avoid overly broad requests, harassment, or disclosure of privileged information). Accordingly, with respect to net-worth discovery during the oral depositions of Dr. Jacobs and Dr. Gunn, the McCoys are limited to asking each physician to state (1) his or her current net worth, i.e., the amount of current total assets less current total liabilities determined in accordance with generally accepted accounting principles ("GAAP"),[11] and (2) the facts and methods used to calculate what each physician alleges is his or her current net worth. Any questioning beyond these two narrow inquiries shall be allowed only upon leave of the trial court after a showing that the McCoys have reason to believe that the information provided was incomplete or inaccurate. *See In re Prudential,* 148 S.W.3d at 136 (explaining mandamus is appropriate in exceptional cases "to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments"). And to the extent more specific limitations are appropriate, such as on the amount of on-the-record deposition time that may be devoted to questioning about net worth, we leave that to the sound discretion of the trial court.

## E

■ Finally, the relators assert the trial court abused its discretion by ordering them to create and produce affidavits in a format of what would have been provided to a lender as to their respective net worth. The trial court ordered the relators to produce "the actual financial statements they have provided to a lender within the past two-years." Alternatively, the trial court directed the relators, if they had not submitted any such financial statements to a lender within the preceding two years, to produce (1) an affidavit swearing that no such financial statement has been submitted, and (2) an affidavit in the form of what would have been provided to a lender as to net worth. It is well-settled that a party cannot be forced to create documents that do not exist for the sole

---

11. Although section 41.011 provides that the fact finder shall consider evidence, if any, of the defendant's "net worth," the statute does not define that term. Tex. Civ. Prac. & Rem. Code Ann. 41.011(a)(6); *see also Lunsford,* 746 S.W.2d at 475 (Gonzalez, J., dissenting) (criticizing court's failure to define "net worth"). The parties have not cited, and we have not found, any cases defining the term "net worth" in connection with the recovery of punitive damages. However, "net worth," as used to ascertain the amount of security required to suspend a judgment pending appeal, has been defined as the difference between total assets and liabilities determined in accordance with GAAP. *See Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.,* 171 S.W.3d 905, 914 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (defining "net worth" as difference between total assets and liabilities determined in accordance with GAAP after thorough discussion of numerous authorities); *see also* Black's Law Dictionary 1041 (6th ed. 1990) (defining net worth as "the amount by which assets exceed liabilities").

purpose of complying with a request for production.[12] Therefore, the relators are *not* required to create affidavits in a format of what would have been provided to a lender to comply with the McCoys' request for production.[13] Instead, the relators are required to produce in response to the McCoys' requests for production only documents that already exist. In keeping with our above-holding, any such information is limited to the relators' respective current net worth, as well as whatever other limitations the trial court has set forth or may yet impose.

## III

We deny the relators' petition with regard to their assertions that the McCoys are precluded from seeking discovery of information of any net worth because Texas law requires a claimant first to make a prima facie showing of entitlement to punitive damages and the McCoys have not pleaded sufficient allegations of conduct entitling them to punitive damages.

We conditionally grant the relators' petition with regard to the trial court's order of January 23, 2009, requiring the relators to produce net-worth information for the past two years. The relators are required to produce only current net-worth information. Further, the relators are not required to create affidavits in a format of what would have been provided to a lender, but are required only to produce documents in response to the McCoys' request for production that already exist. The tri-

al court is directed to modify that portion of its order accordingly.

We further conditionally grant the relators' petition with regard to the trial court's order of January 30, 2009, permitting the questioning of Dr. Jacobs and Dr. Gunn about their respective current net worth. Specifically, the McCoys are limited to asking each physician to (1) state his or her current net worth, i.e., the amount of current total assets less current total liabilities, and (2) the facts and methods used to calculate what each physician alleges is his or her current net worth. Moreover, any questioning beyond these two narrow inquiries shall be allowed only upon leave of the trial court after a showing that the McCoys have reason to believe that the information provided was incomplete or inaccurate. The trial court is directed to modify that portion of its order accordingly, and is free to otherwise impose whatever other limitations it determines, in its discretion, to be appropriate.

We lift our stays issued on February 4, 2009, and March 6, 2009. The writ will issue only if the trial court fails to act in accordance with this opinion.

SULLIVAN, J., concurring.

KENT C. SULLIVAN, Justice, concurring.

The Court today reaches a result consistent with the current state of Texas law. I write separately only to note that the current Texas rule on net-worth discovery is now decades-old and, in light of the evolu-

---

**12.** *See In re Guzman,* 19 S.W.3d 522, 525 (Tex.App.-Corpus Christi 2000, orig. proceeding); *Smith v. O'Neal,* 850 S.W.2d 797, 799 (Tex.App.-Houston [14th Dist.] 1993, no writ); *see also In re Colonial Pipeline Co.,* 968 S.W.2d 938, 942 (Tex.1998) (quoting *McKinney v. Nat'l Union Fire Ins. Co.,* 772 S.W.2d 72, 73 n. 2 (Tex.1989) (op. on reh'g)) ("'[T]his rule cannot be used to force a party to make

lists or reduce information to tangible form.'").

**13.** The relators do not complain about the order in so far as it requires them to produce an affidavit swearing that no such documents had been submitted to a lender in the preceding two years.

tion of Texas law, needs to be revisited. The instant case illustrates how it contributes to unnecessary "satellite litigation" unrelated to the merits of the case and often produces expense and burden far exceeding any potential benefit.

A brief review of the history of this dispute is illustrative. It is noteworthy that the medical incident made the basis of this lawsuit occurred in September 2004. Five years later this legal dispute remains unresolved—even at the trial-court level.

The specific controversy over net-worth discovery is fast approaching its *second* anniversary and has continued largely unabated. It began with an exhaustive request for financial records covering a multi-year period. Those discovery requests inevitably produced—over many months— a flood of objections, hours of court hearings, multiple court orders, and the current *mandamus* proceeding with multiple appellate briefs from each side. The cost to the parties has no doubt been significant. The level of chaos in this case—a tort case with themes common to many such disputes—has given me pause, with a belief that some assessment is in order as to the efficacy of this process as well as the relative value of the discovery in question.

## A. The Role of Net–Worth Discovery in Resolving Material Case Issues

Under the Rules, a trial judge should limit discovery for which the burden or expense outweighs the likely benefit. Tex.R. Civ. P. 192.4(b). In weighing these factors, courts are to consider, among other things, the importance of the proposed discovery in resolving the material issues of the lawsuit. *See id.*

As a general rule, evidence of a party's wealth is irrelevant and prejudicial. *See Carter v. Exxon Corp.*, 842 S.W.2d 393, 399 (Tex.App.-Eastland 1992, writ denied). Consequently, it is almost always inadmissible at trial. *See Cooke v. Dykstra*, 800 S.W.2d 556, 562 (Tex.App.-Houston [14th Dist.] 1990, no writ); *Carter*, 842 S.W.2d at 399.

In *Lunsford v. Morris*, however, the Texas Supreme Court carved out a narrow exception to the general rule of inadmissibility, allowing parties to discover and introduce evidence of a defendant's net worth in cases in which punitive or exemplary damages could be awarded. 746 S.W.2d 471, 473 (Tex.1988) (orig. proceeding), *disapproved of on other grounds by Walker v. Packer*, 827 S.W.2d 833, 842 (Tex.1992) (orig. proceeding). However, *Lunsford* properly should be considered in its historical context.

Specifically, in 1981, the Texas Supreme Court decided to re-visit the standard of review used in reviewing jury awards of punitive damages. *See Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). Under the prior standard, a defendant could successfully challenge a punitive-damages award on appeal simply by pointing to any evidence suggesting he exercised *some care*. *See id.* at 921. However, the Court chose to depart from that standard because it was seen as creating a virtually impossible hurdle to the recovery of punitive damages "since anything may amount to some care." *Id.* In its place, the Court substituted a no-evidence standard of review that effectively "gave 'the jury greater discretion to award punitive damages.' " [1]

In addition, the *Burk* Court authorized plaintiffs to prove "gross negligence," the

---

**1.** Patricia F. Miller, Comment, *2003 Texas House Bill 4: Unanimous Exemplary Damage Awards and Texas Civil Jury Instructions*, 37 St. Mary's L.J. 515, 529 (2006) (citations omitted); *see Burk*, 616 S.W.2d at 922.

standard for imposing punitive damages, merely by constructive notice of the defendant's subjective state of mind. *See Burk*, 616 S.W.2d at 922. Four years later, the Court re-affirmed that holding and also expanded the definition of "gross negligence" to give plaintiffs additional methods to prove a defendant's culpability for exemplary damages:

> [T]he test for gross negligence is both an objective and a subjective test. A plaintiff may prove a defendant's gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. *In addition*, a plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.

*Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 573 (Tex.1985) (emphasis added), *superseded by statute as recognized by Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 n. 11 (Tex.1994).

In 1987, the Texas Legislature began to scale back the availability of punitive damages by enacting Chapter 41 of the Texas Civil Practice and Remedies Code.[2] However, while the original version of Chapter 41 introduced basic limitations to the recovery of punitive damages,[3] the protections it extended to defendants pale in

comparison with those found in the version currently in effect.[4] *Lunsford* was decided the following year but, apart from a brief mention in one of the dissenting opinions, ignores any discussion of the 1987 reforms or their effect on the Court's expansive exemplary-damage decisions from earlier that decade. *See Lunsford*, 746 S.W.2d at 476 (Gonzalez, J., dissenting).

In 1995, the Legislature passed more sweeping tort reform to the substantive and procedural law governing punitive damages. *See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 108–13 (amended 2003) (current version at Tex. Civ. Prac. & Rem.Code Ann. §§ 41.001–.013 (Vernon 2008 & Supp. 2009)). Chapter 41 was significantly re-written to provide defendants dramatic protection from punitive-damage awards, including:

- Juries could no longer award exemplary damages intended solely to serve "as an example to others," but were instead limited to assessing damages with the purpose of punishing the defendant.
- The Legislature dramatically expanded Chapter 41's coverage to apply to all but a very few types of tort actions.
- A plaintiff's burden of proof for punitive damages was elevated to require proof of all elements by clear and convincing evidence.

---

2. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 (amended 1995 & 2003) (current version at Tex. Civ. Prac. & Rem.Code Ann. §§ 41.001–.013 (Vernon 2008 & Supp. 2009)).

3. For example, the tort-reform legislation included a basic cap on exemplary damages. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12 sec. 41.007, 1987 Tex. Gen. Laws 37, 46 (amended 1995 & 2003). In addition, the legislature effectively abrogated the purely objective method of proving gross

negligence. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 n. 11 (Tex.1994). However, because this narrower definition of "gross negligence" applied only to products-liability cases and certain negligence actions, courts continued to apply *Burk Royalty* and *Steves Industries* to all other gross-negligence suits. *See* J. Stephen Barrick, Comment, *Moriel and the Exemplary Damages Act: Texas Tag–Team Overhauls Punitive Damages*, 32 Hous. L.Rev. 1059, 1066 (1995).

4. *See infra* pp. 49–50.

- With few limitations, a defendant could no longer be exposed to punitive damages because of another person's criminal act.
- The Legislature lowered the existing cap on punitive damages.
- Upon a defendant's motion, the trial court had to bifurcate the jury's determination of the amount of punitive damages, and evidence of a defendant's net worth could not be admitted during the liability phase of the trial.

*Id.* These substantive and procedural amendments changed the legal landscape on two levels. First, they further limited the *amount* of punitive damages that could be assessed. *See id.* § 1 secs. 41.007, 41.008. Second, and more significantly, these revisions dramatically lessened the chances of *any* punitive-damage recovery by a claimant. *See id.* § 1 secs. 41.001(5), 41.002, 41.003(b), 41.005.

In 2003, the Legislature further eroded a plaintiff's ability to recover punitive dam-

ages as a part of comprehensive tort-reform legislation.[5] Now, unlike the general rule permitting a civil verdict upon the vote of only *ten* jurors, an award of punitive damages requires a *unanimous* verdict as to liability for, and the amount of, such damages. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.003(d) (Vernon 2008 & Supp. 2009); Tex.R. Civ. P. 292; *Deatley v. Rodriguez*, 246 S.W.3d 848, 850 (Tex. App.-Dallas 2008, no pet.).

In their brief, the McCoys acknowledge the dramatic shift in the law on punitive damages since *Lunsford*, as the Legislature has repeatedly acted "to tightly restrict the ability of litigants to seek and recover exemplary damages."[6] Thus, in the current legal climate, far fewer cases are likely to present fact issues for trial as to punitive-damage liability than when *Lunsford* was decided more than two decades ago.[7] Accordingly, because net-worth discovery may serve little practical purpose in many cases,[8] trial courts perform-

---

5. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 13.01–.08, 2003 Tex. Gen. Laws 847, 886–89 (current version at Tex. Civ. Prac. & Rem.Code Ann. §§ 41.001–.013 (Vernon 2008 & Supp. 2009)).

6. *See* Miller, *supra* note 1, at 520 ("[T]he unanimity requirements make it more difficult for a plaintiff to receive a punitive damage award from a Texas jury.").

7. In fact, some might argue Chapter 41, as currently constituted, imposes punitive-damage liability only for *intentional* torts. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 41.001(7), (11), 41.003(a) (authorizing exemplary damages only for fraud, malice, and gross negligence, where malice requires proof of "a specific intent . . . to cause substantial injury or harm" and gross negligence similarly mandates a showing of the defendant's (1) actual, subjective awareness of an extreme degree of risk *and* (2) consciously indifferent decision to proceed nonetheless).

8. Indeed, discovery into a defendant's net worth may consume a disproportionate

amount of attention inasmuch as net worth is only one among several factors a jury should consider, and not even the most important factor in reviewing an amount of punitive damages. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.011(a) (Vernon 2008); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45–46 (Tex.1998) ("[T]he degree of reprehensibility of the defendant's conduct is '[p]erhaps the most important indicium' of the reasonableness of a punitive damage award.") (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). In fact, until *Lunsford*, a defendant's net worth was not even listed as a factor for the jury to consider in awarding punitive damages. *See Lunsford*, 746 S.W.2d at 472–73; *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). Even so, a post-*Lunsford* jury may still decide on the amount of punitive damages without considering evidence of the defendant's net worth. *See Durban v. Guajardo*, 79 S.W.3d 198, 210–11 (Tex. App.-Dallas 2002, no pet.).

ing a benefit-to-burden analysis should consider appropriate management of the scope of such discovery corresponding to its utility in resolving these important issues. *See* Tex.R. Civ. P. 192.4(b).

## B. Burden and Expense of Net–Worth Discovery

The benefits of net-worth discovery are likely limited in most cases, but the direct and indirect costs may not be. Of course, a case against a publicly traded corporation may present little problem in this respect, as its net worth should be discernible simply from the contents of a widely available annual report. Under that scenario, the burden and expense of the proposed discovery would be minimal. *See id.*

A private individual, however, presents a far different profile with, at minimum, potentially serious issues as to privacy rights and availability of responsive information. Net-worth discovery as to an individual will almost inevitably require—and deserve—much more management and oversight by the trial court.[9] *See In re Weekley Homes, L.P.,* 295 S.W.3d 309, 316 (Tex. 2009) (orig. proceeding) ("To the extent possible, courts should be mindful of protecting sensitive information and should choose the least intrusive means of retrieval.").

In this case, the McCoys sought audited financial statements that, while invasive, may at least represent one of the most accurate and efficient ways for indicating an individual's net worth, if available.[10] However, they also sought countless other categories of documents that have been *repeatedly* held undiscoverable, such as income-tax returns,[11] or which possess only the most indirect and tenuous connection to net worth. Among this latter category of documents are the McCoys' requests for (1) HUD statements reflecting the sale or purchase of real estate; (2) "any and all contracts that you are a party to with any health insurance company, HMO, including Medicare and/or Medicaid, managed care entity, or hospital"; (3) any documents reflecting accounts receivable, from any time period, for the provision of medical care; (4) accounts receivable due to the defendant's "participation in any clinical drug trials, medical device trials, or other medical product trials" for the purpose of obtaining FDA approval; and (5) all medical bills issued for an entire calendar year, presumably as to all of the physicians' patients, "touching, concerning, or dealing with" the provision of medical care.

This sort of invasive discovery generally raises very serious privacy concerns, but that is not its only cost. It also imposes additional burden and expense on the parties and their attorneys, as well as occupying the limited resources of the trial court and, now, this appellate court. *See Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 331–32 (Tex.1993) (Gonzalez, J., concurring) (commenting on the privacy concerns and potential for abuse inherent in the "unlimited discovery . . . of sensitive, private, and confidential financial information").

---

9. Closed corporations and closely-held corporations may present similar, albeit somewhat less serious, issues.

10. *See Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 559 (Tex.1992) (orig. proceeding). Of course, the average private individual is highly unlikely to have audited financial statements readily available.

11. *See id.; see also Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 331 (Tex.1993) (Gonzalez, J., concurring) (surveying numerous cases precluding discovery into federal income-tax returns).

However, this sort of discovery should not be unexpected given the Texas Supreme Court's lengthy silence as to both the precise definition of "net worth" in this context and the proper boundaries for the discovery and ultimate presentation of information as to a defendant's net worth:

> This Court in *Lunsford* failed to define net worth and failed to suggest a procedure for placing such evidence before the jury. I predicted then that in the absence of guidance from this Court, "confusion will prevail as practitioners and judges attempt to ascertain the components of 'net worth.'" *Lunsford,* 746 S.W.2d at 475.
>
> Conflicting appellate court decisions on the meaning of the term "net worth" are evidence of the confusion surrounding this fundamental issue. This confusion should be resolved by this Court.

*Wal–Mart,* 868 S.W.2d at 330 (Gonzalez, J., concurring) (citations omitted); *see also Lunsford,* 746 S.W.2d at 476 (Gonzalez, J., dissenting) (calling for clear definition of term "net worth" and clarity on types of documents relevant to calculate it).

Here, the majority attempts to fairly bridge some of this gap by offering a solid definition of "net worth" as assets minus liabilities. *See* Black's Law Dictionary 1041 (6th ed. 1990); *Wal–Mart,* 868 S.W.2d at 330–31 (Gonzalez, J., concurring). Yet, even this pronouncement may still lead to disagreements about the documents that are relevant and discoverable to calculate this figure, in light of the relative lack of guidance on this issue.

Trial courts have the necessary management tools to control the sequence, timing, and scope of discovery to minimize burden, maximize efficiency, and protect privacy rights.[12] *See* Tex.R. Civ. P. 166, 192. Still, we must acknowledge that there are literally hundreds of Texas trial-court judges—spread over 254 counties—who may preside over cases with claims for exemplary damages and, of necessity, disputes involving net-worth discovery. They each have different backgrounds, different approaches, and different dockets. Those dynamics are likely to produce a highly unpredictable and idiosyncratic approach to the management of these issues across the state—and history shows us that these are issues that regularly recur. I believe parties to litigation in Texas are entitled to greater clarity and predictability from our courts. Accordingly, I would urge that *Lunsford* be revisited and updated.

---

12. For example, in appropriate cases, some trial courts use a docket-control order to schedule and hear summary-judgment motions on predicate exemplary-damage issues in advance of allowing pre-trial discovery on net worth. This approach could limit discovery disputes and the potential cost of compliance to only what is necessarily justified by the facts and claims of the case. Similarly, trial courts may wish in certain cases to allow only the threshold discovery of net-worth amounts by way of limited disclosure at one stage of pre-trial, and delay discovery as to underlying facts or methods of calculation of those amounts—potentially much more invasive and complicated—until a later point when necessary.